# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-01021-COA

**BENITHA CALVIN-WILLIAMS, WIFE OF EDDIE ANDREW FITZGERALD WILLIAMS, III, DECEASED**                                                   **APPELLANT**

**v.**

**THE GREENVILLE CLINIC, P.A.**                                                   **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/05/2023 |
| TRIAL JUDGE: | HON. RICHARD A. SMITH |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ELLIS TURNAGE |
| ATTORNEYS FOR APPELLEE: | TOMMIE G. WILLIAMS |
| | JAMES LAWRENCE WILSON IV |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 04/22/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**WEDDLE, J., FOR THE COURT:**

¶1.     Benitha Calvin-Williams filed a medical-malpractice lawsuit in the Bolivar County Circuit Court against multiple defendants, including The Greenville Clinic P.A. (the Clinic). Benitha alleged that the defendants' negligence proximately caused the death of her husband, Eddie Williams III.  After all the defendants except the Clinic had been dismissed from the lawsuit and venue had been transferred to Washington County, the Clinic moved to strike the causation testimony of Benitha's expert witness, Dr. Brian Swirsky, and for summary judgment.

¶2.     The Washington County Circuit Court concluded the opinions Dr. Swirsky provided

as to the proximate cause of Eddie's death were neither relevant nor reliable. As a result, the circuit court granted the Clinic's motion to strike that portion of Dr. Swirsky's testimony. Because Dr. Swirsky was Benitha's only expert medical witness and his opinions as to causation had been stricken, the circuit court found that no further genuine issues of material fact remained in dispute. Thus, the circuit court awarded summary judgment to the Clinic.

¶3. On appeal, Benitha argues that the circuit court erred by striking Dr. Swirsky's causation testimony and granting summary judgment to the Clinic. Upon review, we find no error. We therefore affirm the circuit court's order.

**FACTS**

¶4. On April 20, 2012, Eddie was admitted to Delta Regional Medical Center (DRMC) in Greenville, Mississippi, for chest pain. Dr. Benjamin Folk, a cardiologist with the Clinic, consulted on the case and treated Eddie. Eddie remained at the hospital overnight and underwent various laboratory and diagnostic tests, including a chest x-ray, an echocardiogram, multiple electrocardiograms (EKGs), and a stress test. DRMC discharged Eddie the following morning on April 21, 2012, with instructions for him to follow up with Dr. Folk in two weeks and to see his primary-care physician as well.

¶5. Eddie never scheduled a follow-up appointment with Dr. Folk. He did, however, continue to see his long-time primary-care physician, Dr. Bill Lewis of the Rosedale Family Medical Clinic in Rosedale, Mississippi. Dr. Lewis's medical records showed that both before and after Eddie's hospitalization at DRMC, he treated Eddie for various medical conditions, including hypertension (high blood pressure), hyperlipidemia (high cholesterol),

2

and obesity. More specifically, Dr. Lewis's records reflected that during the time between Eddie's hospitalization in April 2012 and his final visit to Dr. Lewis on December 31, 2014, Eddie never obtained optimal levels for his blood pressure, cholesterol, or weight. On August 16, 2015, Eddie suddenly collapsed and was transported by ambulance to a medical center, where he was pronounced dead. No autopsy was performed on Eddie's body. The death certificate identified Eddie's cause of death as sudden cardiac death resulting from high blood pressure, high cholesterol, and obesity.

¶6. On October 10, 2017, Benitha filed a medical-malpractice lawsuit in Bolivar County Circuit Court against multiple defendants and alleged that their negligence had proximately caused Eddie's death. Benitha designated Dr. Swirsky, a cardiologist, as her expert medical witness. Dr. Swirsky opined that Dr. Folk's treatment and care of Eddie in April 2012 breached the standard of care owed to Eddie and proximately caused Eddie's death in August 2015. Ultimately, all the defendants except the Clinic were dismissed, and venue was transferred from Bolivar County to Washington County. The Clinic then moved to strike Dr. Swirsky's causation testimony. As the Clinic pointed out, the undisputed evidence showed "Dr. Folk's only encounters with [Eddie] occurred on April 20 and 21, 2012[,]" and that Eddie "died over three years later without ever seeing Dr. Folk again." The Clinic asserted that Dr. Swirsky's testimony failed "to establish a causal link between the treatment provided in 2012 and [Eddie's] death in 2015." The Clinic further asserted that Dr. Swirsky's testimony was neither "reliable" nor based on "any recognized methodology for proving cause of death." As a result, the Clinic requested that the circuit court not only strike Dr.

3

Swirsky's causation testimony but also grant summary judgment in its favor.

¶7. After considering the parties' arguments and evidence, the Washington County Circuit Court determined that Dr. Swirsky was qualified to testify as an expert in cardiology. The circuit court also determined, however, that Dr. Swirsky's opinions were "not reliable as they [were] not based on sufficient data and methods and [were] not relevant as his opinions [would] not aid the trier of fact in its determination of causation." Specifically, the circuit court found that Dr. Swirsky's opinions failed to describe the methodology he had relied on in reaching his conclusions as to causation or that any "un-described methodology" he had used was "accepted in the scientific community." The circuit court further found that Dr. Swirsky's opinions as to Eddie's cause of death did "not qualify as scientific knowledge" because they were "not supported and based upon" known facts and evidence. Instead, the circuit court concluded that Dr. Swirsky's opinions as to causation were "subjective and unsupported speculation." The circuit court therefore struck Dr. Swirsky's expert causation testimony. Because Dr. Swirsky was Benitha's only expert witness and the circuit court found his testimony was insufficient to establish the essential element of causation, the circuit court granted the Clinic's motion for summary judgment. Aggrieved, Benitha appeals.

**STANDARD OF REVIEW**

¶8. "In determining whether the trial court properly granted or denied a motion for summary judgment, we conduct a de novo review of the record." *Turner & Assocs. P.L.L.C. v. Est. of Watkins ex rel. Watkins*, 357 So. 3d 1087, 1092 (¶17) (Miss. Ct. App. 2022)

4

(quoting *Brewer ex rel. Brewer v. Miss. Farm Bureau Cas. Ins. Co.*, 328 So. 3d 721, 723 (¶7) (Miss. Ct. App. 2021)). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). We will find a "genuine" dispute exists "when the evidence is such that a reasonable jury could return a verdict for the nonmovant." *McDill ex rel. McDill v. Scott Cnty. Sch. Dist.*, 396 So. 3d 530, 534 (¶13) (Miss. Ct. App. 2024) (internal quotation mark omitted). When reviewing a trial court's grant of summary judgment, we view the evidence "in the light most favorable to the non-moving party[,]" and we will only reverse "if there are indeed triable issues of fact." *Turner & Assocs.*, 357 So. 3d at 1092 (¶17) (quoting *Byrd v. Bowie*, 933 So. 2d 899, 902 (¶5) (Miss. 2006)).

## DISCUSSION

¶9. Benitha argues that the circuit court erroneously granted summary judgment to the Clinic after striking the testimony of her expert medical witness, Dr. Swirsky, as to the essential element of causation. The circuit court ultimately concluded that Dr. Swirsky's testimony as to the proximate cause of Eddie's death was not "the product of reliable principles and methods" or "sufficient facts or data" and therefore would not assist "the trier of fact to determine [the] fact[s] in issue . . . ." *See* MRE 702 (defining expert-witness testimony). The circuit court found Benitha failed to establish that the Clinic proximately caused Eddie's death through the care and treatment that its employee Dr. Folk provided during Eddie's hospitalization at DRMC. The circuit court then determined that no other

5

genuine issue of material fact remained. As stated, Benitha challenges the circuit court's findings regarding both the reliability and relevance of Dr. Swirsky's causation testimony and the grant of summary judgment in favor of the Clinic.

¶10. To prove a medical-malpractice claim, the plaintiff must establish the following by a preponderance of the evidence:

> (1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the defendant failed to conform to that required standard; (3) the defendant's breach of duty was a proximate cause of the plaintiff's injury; and (4) the plaintiff was injured as a result.

*Cleveland Med. Clinic PLLC v. Easley*, 287 So. 3d 1038, 1046 (¶20) (Miss. Ct. App. 2019) (quoting *Harper v. Hudspeth Reg'l Ctr.*, 270 So. 3d 239, 244 (¶20) (Miss. Ct. App. 2018)). Further, through expert testimony, the plaintiff must demonstrate "that the defendant's failure to conform to the required standard of care 'was the proximate cause, or proximate contributing cause, of the alleged injuries.'" *Id.* (quoting *McDonald v. Mem'l Hosp. at Gulfport*, 8 So. 3d 175, 180 (¶12) (Miss. 2009)). "Expert testimony is essential in medical malpractice cases . . . ." *Stuart v. St. Dominic-Jackson Mem'l Hosp.*, 311 So. 3d 1192, 1203 (¶56) (Miss. Ct. App. 2020) (quoting *Miss. Baptist Med. Ctr. Inc. v. Phelps*, 254 So. 3d 843, 845 (¶7) (Miss. 2018)). "When a plaintiff fails to provide expert testimony establishing a prima facie case of medical malpractice, generally, a grant of summary judgment is required." *Id.*

¶11. We review "[a] trial court's . . . exclusion of expert testimony . . . for an abuse of discretion, and that decision will stand unless the reviewing court concludes that the decision

6

was arbitrary and clearly erroneous." *Id.* at (¶57) (citation and internal quotation marks omitted). To satisfy the admissibility requirements of Mississippi Rule of Evidence 702, "(1) the expert testimony must be based on sufficient facts or data, (2) it must be the product of reliable principles and methods, and (3) the expert must have reliably applied the principles and methods to the facts of the case." *Id.* at (¶59) (quoting *Hubbard ex rel. Hubbard v. McDonald's Corp.*, 41 So. 3d 670, 675 (¶18) (Miss. 2010)). Essentially, "to be admissible, [expert testimony] must be both relevant and reliable; that is, the testimony must be capable of being applied to the facts at issue and scientifically valid." *Thomas v. Shed 53 LLC*, 331 So. 3d 66, 73 (¶25) (Miss. Ct. App. 2021) (internal quotation marks omitted). The proponent of "the testimony must show that the expert based his opinion not on opinions or speculation, but rather on scientific methods and procedures." *Id.* (quoting *Tunica County v. Matthews*, 926 So. 2d 209, 213 (¶6) (Miss. 2006)).

¶12.    When Benitha designated Dr. Swirsky as her expert medical witness, she stated Dr. Swirsky planned to testify that Dr. Folk's alleged negligence in 2012 proximately caused Eddie's death in 2015. During his deposition, Dr. Swirsky opined that Eddie died of a sudden cardiac event. Dr. Swirsky admitted, however, that no evidence showed Eddie suffered a known cardiac event between the time of his discharge from Dr. Folk's care in April 2012 and his death in August 2015. Nevertheless, Dr. Swirsky maintained that Dr. Folk's evaluation and treatment of Eddie in April 2012 breached the standard of medical care in the following ways: Dr Folk (1) failed to properly interpret the results of the stress test and EKGs performed on Eddie; (2) failed to diagnose Eddie with "active coronary artery disease

7

[(CAD)]"; (3) failed to recommend that Eddie undergo "cardiac catheterization and diagnostic coronary angiography"; (4) failed to treat Eddie for "an acute coronary syndrome"; and (5) prematurely discharged Eddie from DRMC without a diagnosis of and treatment for CAD.

¶13. According to Dr. Swirsky, Eddie's death was caused by "either an acute myocardial infarction, which led to a fatal arrhythmia, or a fatal arrhythmia independent of an acute myocardial infarction due to severe underlying undiagnosed and untreated [CAD] . . . ." As discussed, Dr. Swirsky opined that at the time Dr. Folk treated Eddie in 2012, Eddie had CAD, which resulted in an obstruction or blockage within Eddie's arterial system. Dr. Swirsky further opined that Eddie's CAD would have worsened until causing his death in 2015. Dr. Swirsky acknowledged that he lacked any conclusive proof from either imaging or cardiac catheterization that Eddie had CAD in 2012. Dr. Swirsky explained that he had reached his presumptive diagnosis of CAD based on his own interpretation of Eddie's 2012 stress test. Dr. Swirsky admitted, though, that from the medical records he had been given to review, Eddie never successfully lowered his cholesterol to an optimal range. In addition, Dr. Swirsky admitted that if Eddie had undiagnosed CAD in 2012, the disease would have progressively worsened over time and been exacerbated by his high cholesterol levels.

¶14. As discussed, based on his belief that Eddie had CAD in April 2012, Dr. Swirsky opined that Dr. Folk breached the standard of care owed to Eddie by failing to diagnose the disease prior to Eddie's discharge from DRMC and by failing to perform a cardiac catheterization on Eddie. Dr. Swirsky stated that performing a cardiac catheterization on

8

Eddie prior to his discharge would have avoided any potential "risk of harm" associated with delaying the procedure. Dr. Swirsky acknowledged, however, that any "risk of harm" he discussed during his deposition was "all hypothetical" given that Eddie was never actually diagnosed with CAD, and no cardiac catheterization was ever performed, either in 2012 or over the next three years before Eddie's death in 2015.

¶15. The Clinic designated Dr. Jane Turner, a forensic pathologist, as one of its expert medical witnesses. Dr. Turner stated in her affidavit that as a forensic pathologist, she used her specialized training and experience, as well as accepted methodology, to perform autopsies and death investigations and determine a person's cause and manner of death with reasonable certainty. After reviewing Eddie's medical records, the documents pertaining to his death, and Dr. Swirsky's deposition testimony and expert opinions, Dr. Turner concluded that Dr. Swirsky had "fail[ed] to employ accepted scientific methodology in reaching his conclusions regarding cause of death."

¶16. Dr. Turner noted that any investigation into Eddie's death would be "significantly hampered by the lack of an autopsy." Dr. Turner found that Eddie's medical records provided no indication he had "suffered any recurrence" of his 2012 chest pain "or that he complained [of] any other conditions suggestive of ischemic heart disease prior to his death." Dr. Turner stated there was "no evidence available which would allow one to offer a valid medical opinion regarding the location of a presumed coronary artery lesion in April[] 2012[,] and, more importantly, whether additional lesions arose in the same or other coronary arteries in the three years that followed . . . ." Thus, according to Dr. Turner, even assuming

that Eddie had "a significant coronary artery lesion (blockage) present in April[] 2012, it [was] impossible to conclude that this particular lesion resulted in [his] death some three years later."

¶17.    Because the medical records did show, however, that Eddie "remained overweight, hypertensive[,] and with high cholesterol levels following his discharge from DRMC in April[] 2012," Dr. Turner opined that "one can be reasonably certain . . . these medical conditions progressed, thus increasing [Eddie's] risk of death[,] including cardiac death." Given the likely progression of Eddie's known medical conditions and the lack of an autopsy, Dr. Turner further opined "there [we]re multiple conditions" that were "capable of causing the type of sudden death we see here [in Eddie's case] and which [we]re not ruled out."

¶18.    According to Dr. Turner,

> [a]pplying the principles of death investigation from the field of forensic pathology, and when proceeding without an autopsy, the pathologist should collect and review the patient's available medical records as I have done in this case.  Considering the content of the medical records, and applying the principles and practices accepted in forensic pathology[,] it is most likely that [Eddie] died as a result [of] a sudden fatal cardiac arrhythmia (irregular heart beat, including asystole) as a result of his proven hypertensive heart disease. Such is a well[-]established cause of sudden cardiac death.

In discussing Dr. Swirsky's alternate opinion that Eddie's "death was caused by or related to an undiagnosed medical condition (coronary artery obstruction)" that Dr. Swirsky presumed existed in April 2012, Dr. Turner concluded such an opinion lacked any "sound or medically accepted basis[,]" was "entirely speculative[,] and would not be considered reliable in the field of forensic pathology."

¶19.    The Clinic also designated retired cardiologist Dr. Malcolm Taylor as an expert

witness. Dr. Taylor stated in his affidavit that he had retired from his cardiology practice in 2020 and had treated many patients similar to Eddie over the course of his forty-two-year career. After reviewing all relevant evidence, Dr. Taylor concluded that Dr. Swirsky's causation testimony linking the treatment Dr. Folk provided in 2012 with Eddie's death in 2015 was "speculative" and "not based on sound medical principles."

¶20. Dr. Taylor noted that Dr. Swirsky's interpretation of Eddie's 2012 stress test led Dr. Swirsky to assume Eddie had undiagnosed CAD. Dr. Taylor stated, however, that a "stress test does not and cannot provide information as to the location of a presumed occlusion with the coronary artery system, nor does it provide any reliable information regarding the precise nature of same." Even "[a]ccepting, for the sake of argument, that [Eddie's] death in 2015 was the result of [CAD]," Dr. Taylor explained that "there is no scientifically reliable method for establishing whether the condition which caused death in 2015 was present in 2012." As Dr. Taylor stated, there was no way to determine if Eddie developed an artery lesion after Dr. Folk treated him in 2012 or if any subsequently developing lesions could have contributed to his death in 2015. Moreover, Dr. Taylor explained there was "no way to reliably opine that treating a coronary artery lesion in 2012 would have prevented the development and/or progression of additional lesions following treatment." Dr. Taylor stated that to his knowledge, "no reliable or medically accepted methodology" existed in cardiology to support "Dr. Swirsky's opinions that [Eddie's] death in 2015 was proximately caused by some poorly defined coronary artery disease which required treatment in April[] 2012." According to Dr. Taylor, Dr. Swirsky's causation testimony regarding Eddie's death was therefore speculative

11

and unreliable.

¶21.    Upon review, we find no abuse of discretion in the circuit court's decision to strike Dr. Swirsky's causation testimony. "Ultimately, an expert's opinion is reliable if it is grounded in the methods and procedures of science, not merely his subjective beliefs or unsupported speculation." *Miss. Dep't of Rehab. Servs. v. Butler*, 384 So. 3d 546, 554 (¶25) (Miss. Ct. App. 2024) (citation and internal quotation mark omitted). Here, the expert testimony, including Dr. Swirsky's own statements, reflected that no medical evidence revealed Eddie had CAD in 2012 that subsequently went undiagnosed and untreated by Dr. Folk. In addition, the medical experts all agreed Eddie's medical records showed no recurrence of a cardiac event in the three years after Dr. Folk treated him. More importantly, all three experts further agreed that Eddie had known medical conditions, including high blood pressure, high cholesterol, and obesity, which could have led to his death in 2015.

¶22.    Given the medical evidence actually known and the lack of an autopsy, both Dr. Turner and Dr. Taylor concluded that Dr. Swirsky's opinion as to the proximate cause of Eddie's death was not based on either sound medical principles or methodology. Because we likewise conclude that Dr. Swirsky's causation opinions failed to surpass the threshold of "unsupported speculation[,]" we find no abuse of discretion in the circuit court's decision to strike that portion of Dr. Swirsky's testimony. *Id.* Without Dr. Swirsky's expert testimony to prove causation between Dr. Folk's treatment of Eddie in 2012 and Eddie's death in 2015, Benitha cannot show the existence of a genuine issue of material fact to survive summary judgment. We therefore also find no error in the circuit court's grant of summary judgment

to the Clinic.

**CONCLUSION**

¶23.    Finding no error in the circuit court's decisions to strike Dr. Swirsky's expert causation testimony and grant summary judgment in favor of the Clinic, we affirm the circuit court's order.

¶24.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., LAWRENCE, McCARTY, EMFINGER AND ST. PÉ, JJ., CONCUR. WESTBROOKS, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, J.**

**McDONALD, J., DISSENTING:**

¶25.    Although I agree with the majority that the admission or exclusion of an expert's testimony is within the discretion of the circuit court, I would find that the circuit court here abused its discretion in excluding Williams's cardiologist expert's testimony. "Abuse of discretion is found when the reviewing court has a 'definite and firm conviction' that the court below committed a clear error of judgment [in] the conclusion it reached upon a weighing of the relevant factors." *The Univ. of Miss. Med. Ctr. v. Littleton*, 213 So. 3d 525, 535 (¶26) (Miss. Ct. App. 2016). In my opinion, the circuit court clearly erred in striking Dr. Swirsky and his opinions that the negligence of the  Clinic's physician, Dr. Folk, caused or contributed to Williams's death.

¶26.    We have held that on the issue of a proximate cause of an injury, "the plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result." *Id*. at (¶29).

13

Relevant to the case at hand is our ruling that concerned a hospital's negligence in *Stuart v. St. Dominic-Jackson Mem'l Hosp.*, 311 So. 3d 1192 (Miss. Ct. App. 2020). In that case, Stuart sued the hospital and his physician, alleging that he became partially paralyzed as a result of their breaches of the standard of care during a CT scan and myelogram. *Id.* at 1196 (¶¶1-5). However, the trial court granted summary judgment in favor of the doctor and hospital after finding that the patient's expert testimony on the required element of causation was too speculative to be admissible. *Id.* at 1204 (¶61). On appeal, this Court upheld summary judgment in favor of the doctor, but we reversed the trial court's summary judgment finding in favor of the hospital. *Id.* at 1209 (¶95). We stated:

> Medical experts are not required to testify to an absolute certainty. *Stratton* [*v. Webb*], 513 So. 2d [587, 590 (Miss. 1987)]. Dr. Kowalski's testimony is not speculative according to *Mariner Health Care Inc. v. Estate of Edwards ex rel. Turner*, 964 So. 2d 1138 (Miss. 2007). Our Supreme Court ruled in *Mariner* that it "does not require that expert testimony conclusively establish the cause of [injury]." *Id.* at 1144 (¶8). Rather, "expert testimony must, at a minimum, show that deviations from the standard of . . . care caused or contributed to the [injury]." *Id.* Dr. Kowalski and Dr. Wiener were able to testify to a reasonable degree of medical certainty that St. Dominic had breached the standard of care.
>
> We must view the evidence "in the light most favorable to the non-moving party." *Tobias v. Univ. of Miss. Med. Ctr.*, 282 So. 3d 1188, 1190 (¶5) (Miss. Ct. App. 2019) (citation omitted). A jury may ultimately conclude that the hospital did not cause injury to Stuart. However, we find that the expert testimony creates a genuine issue of material fact sufficient to hurdle summary judgment.

*Stuart*, 311 So. 3d at 1209 (¶¶94-95).

¶27. Here, Williams's expert, Dr. Swirsky, opined that Williams was in obvious need of cardiac intervention when he was at the hospital in 2012, but Dr. Folk failed to accurately diagnose him and provide him with the care he needed. Specifically, Dr. Swirsky stated:

14

It is my opinion that Dr. Folk breached the standard of medical care in his treatment -- evaluation and treatment of Mr. Williams on April 20th and April 21st, 2012, first by not diagnosing active coronary artery disease, whether we call this an acute coronary syndrome and include heart attack, or acute coronary syndrome and call it unstable angina. It was one or the other. Number two, not treating him for an acute coronary syndrome including treatment for unstable angina or a non-ST elevation myocardial infarction. Number three, misinterpreting the stress test that he performed on April 21, 2012, and not recognizing the very obvious acute new exercise-induced ischemic EKG changes. Number four, not recommending cardiac catheterization and diagnostic coronary angiography. Number five, prematurely discharging Mr. Williams from the hospital without a diagnosis of coronary artery disease and treatment for the same.

Dr. Swirsky concluded that failing to treat Williams at that time allowed his condition to deteriorate and eventually cause Williams's death. Dr. Swirsky was not required to prove causation with certainty, only that it was more likely than not that Dr. Folk's conduct was a cause in fact to a reasonable degree of medical probability. Because Williams was entitled to all favorable inferences from the proof presented, in my opinion, the circuit court abused its discretion, and the case should have proceeded to trial, where a jury could weigh the opinions of the experts presented.

**WESTBROOKS, J., JOINS THIS OPINION.**

15